TAYLOR, for use, etc., *v.* NASHVILLE & CHATTANOOGA RAILROAD COMPANY.

(*Nashville.*　January 4th, 1888.)

1. CHANCERY JURISDICTION. *Injunction of judgment for pre-existing legal defense. Fraud. Negligence.*

A Chancery Court will enjoin a judgment at law, on account of a legal defense existing, but not interposed, at its rendition; where the judgment was obtained through the *mala fides* of the plaintiff, who then knew that it was contrary to the facts and the truth; and where the defendant neither knew the particular facts which rendered the judgment unconscionable, nor had such reason to suspect that a fraud was being practiced upon him, as would have aroused the suspicions of a prudent man; and in such case, the fact that evidence to support such defense existed at the time of the rendition of the judgment, and could have been discovered by defendant, if he had then been put upon inquiry, will not repel him.

Cases cited and approved: Kearney *v.* Smith, 3 Yer., 127; Stone *v.* Moody, 6 Yer., 31; Rice *v.* Bank, 7 Hum., 42; Schwab *v.* Mount, 4 Cold., 62; Rowland *v.* Jones, 2 Heis., 323; Hickerson *v.* Rugnal, 2 Heis., 333; Turley *v.* Taylor, 6 Bax., 377; 3 Atk., 223; 3 Desaussure, 310; 23 Ark., 44; 1 John's Ch., 50; 2 Story, 59, 80; 6 John's Ch., 86; 6 How., 114; 3 Gratt., 3; 7 Blackford, 564; 1 Rich. Eq., 41; 12 Gill & Johnson, 381.

2. ESTOPPEL. *Municipal corporations. Representations of officers. Authority. Knowledge. Opinion.*

A municipal corporation is not estopped to set up a defense to a judgment held against it by an assignee, although its officers—*e. g.,*, its treasurer or attorney—represented to such assignee when about to purchase the judgment that it would be settled or funded; if such representation was made in good faith and without knowledge, or culpable ignorance of the defense, or as mere expression of opinion, or was made without express authority of the City Council.

Cases cited and approved: Nashville *v.* Toney, 10 Lea, 643; 93 Ind., 570; 11 Allen, 349.

Taylor *v.* Railroad Company.

Cases cited and distinguished: Simpson *v.* Moore, 5 Lea, 372; Merriwether *v.* Larmon, 3 Sneed, 448; Deadrick *v.* Mitchell, 6 Bax., 35; 2 Yeates, 541.

FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County. A. G. MERRITT, Ch.

C. D. BERRY, R. McP. SMITH, and THOMAS J. FREEMAN for the Bank.

W. K. McALISTER for City of Nashville.

EAST & FOGG for Railroad Company.

LURTON, J. On the 21st of July, 1878, a judgment was rendered in the Circuit Court of Davidson County in favor of N. A. Taylor and against the Mayor and City Council of Nashville and the Nashville & Chattanooga Railroad Company for $4,-787 and costs. This recovery was upon four past-due bonds of $1,000 each and accumulated interest, being a part of an issue of $500,000 issued by the city of Nashville in aid of the Nashville & Chattanooga Railroad, the payment of the bonds being guaranteed by the latter corporation. On the 21st of August of the same year this judgment was assigned by the attorney of Taylor to the Third

National Bank of Nashville, the bank paying for same the sum of. $4,164.69. Execution had issued and been returned *nulla bona* before assignment.

The bank having made application to the City Council to have the judgment settled by issuance of new bonds, and this having been declined by the city, the original bill in this cause was filed against the Nashville & Chattanooga Railroad to prevent an alleged misapplication of its assets to the payment of a dividend to its share-holders and to reach and subject money in the hands of its treasurer about to be so misapplied, and compel its application to payment of this judgment. By consent of parties, the city of Nashville was permitted to become a party defendant and to file answer and cross-bill.

The questions to be determined in the litigation spring wholly from the cross-bill, which seeks to perpetually enjoin the collection of said judgment, upon the ground that it was procured by fraud, and was therefore void. In substance, it was alleged by the city that this judgment was rendered upon bonds which had already been reduced to judgment in another case in favor of the Pontotoc Insurance Company, the true owner thereof, and that after said judgment the bonds, being a part of the file of papers in the other case, were stolen from the archives of the Court by the plaintiff, Taylor, or by his procurement, and a second suit instituted upon them.

It further charges that the nominal plaintiff,

Taylor, and his attorney of record, I. C. Lanier, were both fictitious personages; that the city and its agents and attorneys at the time of judgment were entirely ignorant of the fraud that was being practiced, ignorant of the fact that the bonds, sued on by Taylor had been before reduced to judgment, or that they had been abstracted from the files of the Court, and of the fictitious character of the suit; and that, having no knowledge of any defense to the suit, the bonds being genuine evidences of city indebtedness, and having no suspicion of the real state of the case, judgment had been permitted without the interposition of any defense; that knowledge of the fraud practiced had only been acquired when it was too late to be of avail at law.

The bill further shows that the plaintiff, Taylor, did not personally appear in Court, neither was he represented by the attorney whose name was signed to the declaration, but that, on the day that the cause was set for trial, Mr. Dillard, a regular practitioner at the Nashville bar, appeared in Court and exhibited the bonds sued upon to the city attorney, who, seeing them to be genuine, and suspecting no fraud and knowing of no defense, suffered judgment to be taken; that the city has since learned that said Dillard had only been retained that day, and that by a letter purporting to come from said attorney of record, Lanier, and inclosing bonds, and instructing him to appear that day and take judgment; that said Dillard never

had seen either Taylor or Lanier, and knew neither, and knew nothing more of the case than the information given in his letter of instruction.

To this cross-bill a demurrer was filed by the bank, raising the question that the bill did not show a judgment procured by fraud, accident, or mistake, wholly without negligence upon the part of the defendant. This demurrer was overruled, and as the question raised by it is the same as that raised by the facts proven, the proof essentially sustaining the allegations of the bill, the assignment of error upon the action of the Court in overruling it will be considered hereafter.

Publication was made for Taylor, who, failing to defend, judgment *pro confesso* was taken against him.

The answer of the bank denies in general terms all the allegations of the bill, and likewise relies upon the defense, as stated in the pleadings, "that before buying the judgment it got its attorney to inquire of complainant's attorney and its Treasurer whether said judgment would be funded, and both of them gave the assurance that this would be done; and it was only on this answer that the purchase was made."

There was a decree by the Chancellor in favor of the city, and an appeal by the bank. As before stated, the proof sustains all of the material allegations of the bill. Are these facts sufficient to justify the interference of a court of equity to restrain the collection of so unconscionable a judg-

ment? The general rule concerning the interposition of the chancery court after a judgment at law is, that where the party had a valid legal defense on the merits, and was prevented in any manner from maintaining it, by fraud, mistake, or accident, and there has been no negligence, laches, or other fault on his part or on the part of his agents, then a court of equity will interfere, and restrain proceedings on the judgment which cannot be conscientiously enforced. 3 Pomeroy Eq. Juris., 400; *Kearney* v. *Smith,* 3 Yerg., 127; *Stone* v. *Moody,* 6 Yerg., 36; *Rice* v. *Bank,* 7 Hum., 42; *Schwab* v. *Mount,* 4 Cold., 62; *Rowland* v. *Jones,* 2 Heis., 323; *Hickerson* v. *Rugual,* 2 Heis., 333; *Turley* v. *Taylor,* 6 Bax., 377.

No branch of the jurisdiction of a court of equity presents less difficulty in the *statement* of the general rule applicable, and none, perhaps, more in its application to the facts of a particular case. When the plaintiff presented himself in the character of a suitor in a court of law, and asked that judgment be pronounced in his favor upon the bonds he based his suit upon, he must be taken to represent that they are his own property, and that they have not been satisfied. He must also be taken to represent himself as being the person he holds himself out as being, and not a fictitious John Doe or Richard Roe. Now, the proof in this case makes it clear that none of these representations were true, and that the party who instituted suit on these bonds and called him-

self N. A. Taylor, knew at the time that he was not entitled to any judgment whatever, and that the solemn verdict in his favor was contrary to truth and right. His judgment was therefore unconscionable, and obtained through an unblushing fraud.

If this litigation was between the fraudulent judgment creditor and the victim of his practices, would he be suffered to reap the fruits of his villainy? The first line of defense offered by the personal owner of the judgment necessarily answers in the affirmative this question, and this upon the proposition well and ably argued that the defense of the city to the suit on these bonds was a plain legal defense, as easily made at law as in equity, and that the failure to make it before judgment was due to negligence, as the proof was as accessible then as now. The reply of the city to this otherwise sound proposition is that its agents and attorney were ignorant of the very facts which make the judgment unconscionable, and that this ignorance was not attributable to any negligence upon its part or upon the part of its agents or attorney. It is undoubtedly true that if the City Attorney, who was charged with the duty of representing the city in this litigation, had compared the bonds sued on with the bonds already paid by the city and with those before reduced to judgment, he would have discovered the fact that the bonds upon which the Pontotoc Insurance Company had recovered judgment in the same Court were

missing. By an examination of the declaration in
that case, he would have learned that the numbers
upon the bonds in the insurance company case cor-
responded with the numbers upon the bonds sued
upon by Taylor. The City Attorney did not do
this, because he did not suspect the honesty of
the suit and was misled by the bonds being gen-
uine on their face and being presented by an at-
torney against whom no suspicion attached. Noth-
ing appeared upon the face of the transaction to
put him upon guard against fraud or to suggest
any line of defense whatever. This brings us to
the question as to whether ignorance of the exist-
ence of a defense, and the absence of all circum-
stances of suspicion, will not, as against a plaintiff
guilty of conscious *mala fides* in the obtention of
any judgment, excuse any effort to present a de-
fense of which the defendant is totally unaware by
reason of the artfulness with which the fraud of
the plaintiff was concocted and concealed.

In the case of *Williams* v. *Lee*, 3 Atk., 223,
Lord Hardwicke said: "As to relief against ver-
dicts for being contrary to equity, those cases are:
*where the plaintiff knew the fact, of his own knowl-
edge, to be otherwise than what the jury found by
their verdict, and the defendant was ignorant of it at
the trial;* as, where the plaintiff's action might be
for a debt, etc., and the defendant, after the ver-
dict, discovers a receipt for the very demand, in
the action here the Court would relieve."

To the same effect was the view of Chancellor

Taylor *v.* Railroad Company.

Desaussure, one of the greatest masters of equity which this nation has ever produced. In the case of *Winthrop* v. *Lane* he said: "It is true that if a party does not use reasonable diligence to obtain testimony material to his cause, it is a neglect for which he must suffer; and he shall not be allowed to renew the litigation on pretense of the discovery of new evidence which he ought to have had before the first trial. But this rule itself has reasonable limits. *The testimony must have been within the knowledge of the party, or he must have had some clew to guide him in the search, before he can be said to have neglected the proper steps to obtain it.*" 3 Desaussure, 310.

In *Reed* v. *Harvey*, 23 Ark., 44, the Court held that "the rule that requires a defendant to make his defense at law by the presentation of every fact of defense existing at the time of trial, has no application to a case where the defendant was not privy to the fact and could not have supposed it to exist."

Chancellor Kent, in discussing the degree of diligence which must be shown by one seeking relief against a judgment, said: "The general rule is that the Court will not relieve against a judgment at law unless the defendant *was ignorant of the fact in question pending the suit,* or it could not have been received as a defense. If a party will suffer a judgment to pass against him by *neglect,* he cannot have relief here for a matter which he might have availed himself of at law. Lord Hard-

wicke said: 'It must appear that the defendant was ignorant at the time of trial of the fact which renders the judgment contrary to equity.'" *Lansing* v. *Eddy*, 1 John's Ch., 50.

A question very similar to the one now being considered is reported in the second of Story's reports, page fifty-nine, where the opinion was by the distinguished author of Story's Equity Jurisprudence. The question arose upon a demurrer to a bill seeking to enjoin a judgment at law upon a policy of marine insurance, and an injunction was sought, upon the ground that the vessel insured had been fraudulently cast away by boring holes in her bottom. It appeared that upon the trial at law the defense was made that the loss was a fraudulent one, and some evidence tending to support this theory was submitted. But the bill alleged that the fact that the vessel had been wrecked by boring holes in her bottom was unknown at the time of trial, and had only been discovered since. In discussing the point that the defense of fraud had been made at law, Judge Story said:

"But the parties admit, for the sake of the argument, that the point of fraud was made at the trial, but that it was in effect founded upon circumstances of suspicion not sustained by any clear and satisfactory proofs, and that the boring of the holes was not known or suspected at the trial; and that it was not and could not, therefore, then have been a matter of controversy. Now, I agree

that mere cumulative evidence to the fact of fraud, or any other leading fact not discovered since the trial, will not ordinarily constitute any just ground for the interference of a court of equity to grant relief, for the solid reason that it is for the public interest and policy to make an end to litigation, or, as was pointedly said by a great jurist, that suits may not be immortal while men are mortal; but I do not know that it has ever been decided that, in an assignable case, where the defense has been imperfectly made out at the trial, from the defect of real and substantial proofs, although there were some circumstances of a doubtful character or some presumptions of a loose and indeterminable bearing before the jury, and afterwards newly-discovered evidence has come out, full and direct and positive, to the very gist of the controversy, a court of equity will not interfere to grant relief and to sustain a bill to bring forth and try the force and validity of the new evidence. My recollection does not furnish me with any case where a doctrine so strict and so binding has been positively upheld and pronounced. The disposition of courts of equity upon this head seems, as far as I can gather it, not to encourage new litigation in cases of this sort, but, at the same time, not to assert their own incompetency to grant relief if a very strong case can be made out. *A fortiori*, all reasoning upon such a point must be powerfully increased in strength when it is applied to a case which, upon the face of the bill, is composed and

concocted of the darkest ingredients of fraud, if not of crime. At all events, it would be an extraordinary course of a court of equity to pronounce such a judgment in such a case upon a demurrer, rather than to retain it for a final adjudication upon a hearing of the merits, where the full pressure of the whole facts and the weight of all the attendant circumstances known at the trial and discovered since, may be fully brought before it. While the court would not be disposed lightly to interfere with the verdict of the jury upon the point of fraud, it might well deem itself at liberty to look deeper into the case, upon new evidence which might justly, if known at the time, have changed the verdict of the jury.

" It does not appear to me that it can be laid down as a positive rule that in no case whatsoever ought relief to be granted, however stringent the evidence may be which goes to establish the fraud asserted, but imperfectly brought out at the trial from the mere defect of evidence, without laches of the party seeking relief in equity. But in the present case I am not prepared to say that the very fraud now preferred in the bill was identical with that propounded at the trial. Fraud in casting away a ship may be very distinguishable from fraud in destroying her by boring holes in her bottom. Both may concur, and be concomitant circumstances of the same general transaction; but they may also constitute distinct and independent transactions and matters of defense. How can a

court of equity, upon a dry demurrer, assert that they are the one rather than the other? If I were compellable to decide, upon the face of this bill, what in this case was the real proximate cause of the loss and destruction of the vessel, I should hold that it was not the casting away of the vessel but the boring of the holes in her bottom; but it is unnecessary to decide that, because, upon a demurrer *in odium spoliatoris,* the Court will not decide a matter of such importance in his favor, but reserve it for a final hearing upon the merits." 2 Story, 80.

In the case last cited the evidence of the boring of holes was just as accessible at the original trial as at the time of the filing of the bill; but, not suspecting that such was the fact, the evidence was not obtained. The bill showed that the vessel in its wrecked condition was, before the suit at law, surveyed and sold, and the proceeds paid over to the insured.

The cases already cited are fully supported by *Foster* v. *Woods,* 6 John's Ch., 86; *Davis* v. *Tileston,* 6 How. U. S. S. C., 114; *Jamison* v. *De-Shields,* 3 Gratt., 3; *Fitch* v. *Polk,* 7 Blackford, 564; *Canty* v. *Blair,* 1 Rich. Eq., 41; *Gordiner* v. *Bowling,* 12 Gill & Johnson, 381.

We are fully attentive to the necessity of maintaining the conclusiveness of a litigation terminated by a judgment at law and of the wisdom of the rule which casts the responsibility for an unjust judgment upon the party whose negligence led to

such a result. But that a court of equity, under the circumstances of this case, could not restrain the fraudulent plaintiff, Taylor, as between himself and the victim of his conscious dishonest conduct, would be an unendurable reproach upon the methods and machinery of that tribunal. The general rule which holds a party negligent who fails to develop every fact which would defeat a recovery upon an iniquitous demand is a reasonable rule, but it has its qualifications and reasonable limitations, and we hold that *where a judgment was obtained through the mala fides of the plaintiff, who at the time knew that the judgment was contrary to the facts and the truth, and where it further appears that the defendant was at the time ignorant of the existence of the very facts which make the judgment unconscionable, and where there was nothing in the circumstances of the litigation or the trial calculated to arouse the suspicion of a prudent man to the fact of a fraud being practiced, a court of equity will interpose and restrain proceedings upon such a fraudulent judgment; and the fact that the defense could have been made at law, and that the evidence was accessible, will not, in such a case, be such negligence as to restrain the exercise of the jurisdiction of this Court.*

But it is next insisted that if it be conceded that, as between Taylor and the city, the latter could obtain relief under the facts of this case, yet that, as between the city and Taylor's assignee of the judgment, the city is estopped to plead the

fraud of Taylor. The assignee of a judgment takes subject to all defenses which could have been made against the assignor. It is conceded that his attitude is that of one who takes a bill after maturity, and therefore subject to all equities which had attached before assignment. But to avoid this familiar and indisputable principle of law, the bank invokes the doctrine of equitable estoppel; and this defense is very earnestly pressed, upon the following state of facts: Within a few days after the rendition of the judgment against the city, Mr. Allison, a most reputable attorney of Nashville, was authorized by the person claiming to be the judgment creditor to make sale of his judgment. Mr. Allison had had no connection whatever with the obtention of the judgment, and had never before seen the person calling himself Taylor, and who represented himself as a merchant residing in Louisville, Ky. Mr. Allison, through a local broker, Mr. McCrory, obtained from the Third National Bank an offer, which was communicated to Taylor by mail, to an address agreed upon. Taylor at once responded, directing Mr. Allison to assign the judgment, and that he would shortly call for his money. Mr. Allison accordingly assigned the judgment upon the docket to the bank, and received from it its check for the agreed consideration. This was paid over to Mr. Taylor, who from that day vanished, and the most vigilant efforts of detectives have been unable to discover his whereabouts, or that any one bearing his name ever ex-

isted. Before the bank concluded its purchase of the judgment, it, as stated in its answer and established by the proof, sent its attorney to inquire of the City Attorney and the City Treasurer "whether said judgment would be funded, and both of them gave assurance that it would be done, and it was only on this answer that the purchase was made." In explanation of this inquiry and the response, it need only be said it is shown that the bonds upon which this judgment was based were part of a series of $100,000 which had matured at same date, and, the city being unable to pay them, and having no property subject to execution, had obtained legislative authority to refund them into a new series of bonds. The City Attorney and Treasurer, being aware of this authority and that the policy and custom of the City Council was to fund the matured bonds when presented for that purpose, and knowing of no infirmity attaching to the judgment, the fraud being as yet undiscovered and unsuspected, answered the inquiry of the bank's attorney that the judgment would be funded. The bank, after its purchase, did petition the City Council, the only authority authorized to fund the judgment, to issue to it new bonds in satisfaction. Upon reference to a committee, the fraud was discovered, and the City Council declined to pay or fund.

Now, do these facts constitute an estoppel *in pais* upon the municipality of Nashville? Mr. Bigelow, in his very able and exhaustive work upon estop-

pels, upon a consideration of all the cases defining an estoppel by conduct, sums up the requisites of such an estoppel:

"*First*—There must have been a representation or a concealment of material facts.

"*Second*—The representation must have been made with knowledge.

"*Third*—The party to whom it was made must have been ignorant of the truth of the matter.

"*Fourth*—It must have been made with the intention that the other party should act upon it."

"*Fifth*—The other party must have been induced to act upon it." Bigelow on Estoppel, 480.

It would seem that this representation was only regarded as an *opinion* by the bank; for Mr. Jones, the cashier, and the officer who represented the bank in the purchase, says: "I *only understood* that the City Attorney and Treasurer *could give assurance or information of the custom of the city authorities. I did not suppose that they could bind the city.* If there was any obstacle in the way of the judgment, I knew they would know it. As this judgment, by their statements, appeared regular and valid, we did not hesitate to buy it." It is clear that if this representation be regarded as but an opinion, it cannot be held an estoppel. No inquiry seems to have been made as to whether there was any defense or equity as against the judgment. Mr. Berry, the bank's attorney who made the inquiries, states that the City Attorney and Treasurer "assured me that there would be no doubt

about the judgment being funded." He says nothing about any further inquiries than such as would indicate the method by which the demand might be settled. But if we give the broadest possible effect to this representation, and construe it as implying a statement that there was no defense, or none would be made to the enforcement of the judgment, then we have present every element essential to an estoppel *in pais*, unless it be the second, which requires the representation to be made with *knowledge, provided these representations were made by agents of the corporation who were authorized to speak for and bind their principals by an estoppel.*

We will look to the question of the necessity of *knowledge* upon the part of the party making the representation. That the declarations made by these city officers were made in ignorance of the fraud which made the judgment void, and that what they said was said in good faith, and with no intent to deceive, is admitted. That knowledge of the truth by the party making representations is generally essential to an estoppel *in pais*, is perhaps well settled. Several of the cases cited by the counsel for the bank establish this as the general rule. *Anderson* v. *Hubble*, 93 Ind., 570; and same case, 47 Am. Rep., 394; *Andrews* v. *Lyons*, 11 Allen, 349. Our own case of *Simpson* v. *Moore*, 5 Lea, 372, belongs to this class of cases, for there the representation was made by the debtor himself of the validity of the debt, knowing at the time

of the failure of title which entitled him, by the very terms of his contract, to an abatement. It is equally true that where one is ignorant of the truth of the matter through gross negligence, his want of knowledge will not excuse. Bigelow on Estoppel, 540, and cases cited. There are cases which do not take into consideration the want of knowledge when another has been misled to his injury; but these cases stand upon the ground that the declarations of the party make him responsible as upon a new and obligatory promise. *Carnes* v. *Field*, 2 Yeates (Penn.), 541. Such cases are unsatisfactory in their reasoning. The true rule probably is that ignorance shall not excuse where the representations which mislead another are made by a party *consciously ignorant* of the matter to which they relate at the very time that he professes knowledge. Liability can here be predicated as legitimately resulting from a wrongful assumption of knowledge; and upon high moral and politic considerations such a party ought not afterward to be suffered to disclaim an acquaintance with facts which he has once unjustly or incautiously and injuriously assumed to know. Upon this ground the case of *Merriwether* v. *Larmon*, 3 Sneed, 448, and that of *Deaderick* v. *Mitchell*, 6 Bax., 35, proceed. See also, for an able statement of what we conceive to be the true ground, the case of *Preston* v. *Mann*, 25 Conn., 118.

Tested by this principle, the representations were made by officials ignorant at the time of the yet

undiscovered fraud; but it was not a case of one *assuming knowledge,* either willfully or incautiously. They spoke the truth, so far as it was known to them or to any other of the city's agents at that time.. It was not a case of one consciously ignorant and yet assuming knowledge; nor was their ignorance the result of any culpable degree of negligence, as has already been decided in the other branch of this case. Information was sought of certain persons supposed, from their relations to the city, to have a knowledge as to the purpose of the city concerning this debt. Those officers give the inquirer all the information which they have, and, being ignorant of an undiscovered infirmity affecting the demand inquired about, they assume reasonably, and so assure the inquirer, that the debt will be funded.

But upon another and distinct ground the corporation is not estopped by the representations of its City Attorney and Treasurer made concerning this claim; and that is that it was not within the scope, or even apparent authority, of either of them to fasten upon the city any liability by contract, and, *a fortiori,* by their declarations, acknowledgments, or representations, unless expressly authorized by the city charter, or ordinance or resolution of the City Council. We have been referred to no such authority, either in the city charter or in the legislation of the City Council. The charter of the city provides "that the City Council shall have power, by ordinance, to appropriate money and pro-

vide for the payment of the debt and expenses of the city;" and it is further provided "that no person, whether a member of the City Council or officer of the corporation, shall order, contract, or do any thing whereby an expenditure of money is the consequence, or liability is to be incurred, unless authorized by existing laws or ordered by the City Council." This Court heretofore, in construing the powers of city officials under this charter, and in a case where the plaintiff, in a suit against the city upon a most meritorious claim, relied upon an acknowledgment and promise to pay made by the Mayor of the city as a reply to the plea of the statute of limitations interposed by the city, adopted the unreported opinion of Judge Freeman in the case of *Nashville* v. *Fisher et al.*, where he said, speaking for the Court: "We hold the principle to be sound, as stated by the Supreme Court of New Jersey in *Sachem* v. *Seymour*, 24 N. J., 153, 'that the powers of a municipal corporation can only be exercised by the governing legislative body of such corporation, or, we may add, by other agents of such corporation in pursuance of authority given from such governing body in the form of an ordinance or legislative enactment of such body, or in pursuance of powers granted or conferred in the charter by the Legislature.' While we have no doubt that these promises had the effect to lull the plaintiff into security, and may cause a loss which to her may be serious, yet it is clear that these promises of the Mayor were

unauthorized and not binding on the defendant, and hence inoperative to prevent the bar of the statute." *City of Nashville* v. *Toney,* 10 Lea, 643.

The doctrine of this case we regard as conclusive upon the question of the want of authority of these officials to bind the city by their declarations or representations. If they could not do so by express agreement, it must logically follow that they could not do so by indirection, such as an estoppel would be. In the Toney case, just referred to, the "assurances" of the Mayor operated with great hardship, inasmuch as they led to delay in suing until the statute had barred the remedy; but in this case no such hardship resulted, because the agent of the bank knew that these officials could not bind the city by their "assurance" that the judgment would be funded.

The attitude of the bank, under the admissions of its cashier, is not materially different from that of any other purchaser of a non-negotiable chose or past-due paper who buys knowing that he takes the shoes of the assignor, and, to guard against loss, makes inquiry of one whom he supposes, by reason of his attitude and relation to the debtor, is likely to know of the probabilities of payment, and yet at the same time knows, as matter of fact, that the party of whom he makes inquiry has no authority to speak for and bind his principal. The course taken was a prudent one, yet it could not guard against the consequence if it should turn

out, as in this case, that there was a valid defense to the demand.

That there are circumstances under which a municipal corporation may be estopped by the declarations and conduct of its agents is not to be disputed. We have been referred to some cases in which an estoppel was found; but in all to which we have had access the representation was made by an officer strictly within the scope of his duty, and was authorized to speak for the municipality in the matter, and his statement was relied on as binding upon the corporation. If a municipal corporation be treated with reference to its contract relations as *quo ad hoc* a private corporation, the result in this case would be the same; for, clearly, the declarations or representations in this case were made by agents not having authority to bind their principal, and this was confessedly known to the agents of the bank.

There is nothing in the case of *Curron* v. *The Mayor*, 79 N. Y., 511, which conflicts with the views we entertain. The case, upon its facts, was rightly decided. The point pressed by counsel in argument that when a judgment is by confession that there is an estoppel by record as to strangers, is not well taken as matter of fact. The judgment is not in the transcript, and nothing appears as to its form but that which is to be inferred from the statement in the bill of the city that the City Attorney, knowing of no defense, consented

Taylor *v*. Railroad Company.

that judgment might be taken. This implies a consent to the usual formal entry of jury and verdict, or that pleas were withdrawn, rather than a solemn judgment by confession.

The decree of the Chancellor perpetually enjoining any further proceedings upon the judgment will be affirmed with costs.

Judges Snodgrass and Folkes dissent.